JONATHAN WOOD, MT Bar No. 67350062
Email: jonathan@perc.org
DYLAN P. SOARES,* CO Bar No. 58720
Email: dsoares@perc.org
Property and Environment Research Center
2048 Analysis Dr., Ste. A
Bozeman, MT 59718
Telephone: 406-587-9591
*Pro hac vice pending

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BUTTE DIVISION

| | | |
|---|---|---|
| ROCKY MOUNTAIN ELK FOUNDATION and the PROPERTY AND ENVIRONMENT RESEARCH CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; U.S. FISH AND WILDLIFE SERVICE<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. _____<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

INTRODUCTION

1.     The Endangered Species Act (ESA) was enacted to recover species to the point at which they are no longer endangered or threatened with extinction. *See* 16 U.S.C. § 1532(3) (defining the statute's "conservation" mandate in recovery terms); U.S. Fish & Wildlife Serv., *ESA Basics: 50 Years of Conserving Endangered Species* (2023)[1] ("The law's ultimate goal is to 'recover' species so they no longer need protection under the ESA.").

2.     The statute promotes this goal by varying the extent of regulation based on the degree of threat faced by each listed species. It categorically prohibits, without a permit, activities that harm "endangered species." 16 U.S.C. § 1538(a). But for less vulnerable "threatened species," the ESA rejects this categorical approach in favor of regulations tailored to the unique recovery needs of each species. 16 U.S.C. § 1533(d).

3.     As the U.S. Fish and Wildlife Service (Service) has acknowledged, rewarding states and landowners with regulatory relief as species progress toward recovery provides "an incentive to work on recovery actions." Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753, 44,757 (Aug. 27, 2019). This incentive encourages habitat restoration and other recovery efforts "for both endangered species and threatened species." *Id.*

4.     The Rocky Mountain Elk Foundation (RMEF) and Property and Environment Research Center (PERC) are conservation organizations that work to conserve wildlife and habitat. RMEF and PERC frequently partner with state

---

[1] https://www.fws.gov/sites/default/files/documents/endangered-species-act-basics-february-2023.pdf.

agencies and private landowners to fund and implement habitat conservation and restoration projects, including habitat for endangered, threatened, and at-risk species.

5.    On April 5, 2024, the Service enacted the "Blanket Rule," under which the ESA's prohibitions for endangered species apply automatically to threatened species. *See* Regulations Pertaining to Endangered and Threatened Wildlife and Plants, 89 Fed. Reg. 23,919 (Apr. 5, 2024).

6.    The Blanket Rule does not merely impact activities that threaten species recovery but also beneficial conservation activities. The Rule restricts state management of wildlife and habitat, prohibits habitat maintenance and restoration without a costly permit, and reduces incentives for habitat restoration and other recovery efforts. The Blanket Rule does so without any consideration of science, each threatened species' unique conservation needs, or incentives for recovery.

7.    The Blanket Rule violates the ESA. Under that statute, the Service is authorized, "[w]henever any species is listed as a threatened species," to issue regulations "necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). The text of this provision, as well as the ESA's structure, authorizes the Service only to issue regulations in response to each species' listing and tailored to each species based on science, the species' unique conservation needs, and the incentives needed to recover that species. The Blanket Rule circumvents this process. And it contravenes Congress' decision to categorically prohibit only activities that harm endangered species. *See* 16 U.S.C. § 1538(a).

8.    Even if the ESA permitted the Service to issue blanket regulations for threatened species, such regulation would still need to satisfy the statute's "necessary and advisable" for conservation standard. 16 U.S.C. § 1533(d). *See Trout Unlimited v. Lohn*, 559 F.3d 946, 962 (9th Cir. 2009). Under this standard, the Service's decision to issue a regulation under Section 4(d) must be based on that regulation's contribution to a species' recovery. *See id.*; *Christy v. Hodel*, 857 F.2d 1324, 1333–34 (9th Cir. 1988). The Service did not base its decision on such rationale. Instead, the Service offered legally deficient reasons for issuing the Blanket Rule. For instance, the Service asserted that the mere fact of a species' threatened status is enough to conclude that endangered-level regulation is necessary and advisable to its conservation. But this conflates the statute's trigger for the Service's authority with the statutory standard governing the exercise of that authority. 16 U.S.C. § 1533(d) (requiring both that a species be listed as threatened and that a regulation be "necessary and advisable" for its conservation). *See Connell v. Lima Corporate*, 988 F.3d 1089, 1097 (9th Cir. 2021) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used, without rendering words superfluous, void, or insignificant." (internal quotations and citations omitted)).

9.    The Service's decision to issue the Blanket Rule was also arbitrary and capricious. The Service failed to provide a rational explanation for issuing the Rule despite affirming its previous finding that tailoring regulations to each threatened species produces better incentives for states and private landowners to recover species. 89 Fed. Reg. at 23,926 ("We do not deny the benefit of species-specific 4(d)

rules as we referenced in our 2019 4(d) rule."). *See* 84 Fed. Reg. at 44,757 (describing those benefits). It also ignored evidence that the National Marine Fisheries Service (NMFS) has, by tailoring regulations to each threatened species, achieved a recovery rate nearly three times the rate attained by the Service. *See* PERC, Comment Letter Opposing the Proposed Reinstatement of the "Blanket Rule" at 11 (Aug. 21, 2023).[2] And the Service refused to consider how the Blanket Rule imposes costs that affect private landowners' incentives to recover species. 89 Fed. Reg. at 23,934–35. This failure to consider factors required by the ESA's text is arbitrary and capricious. *See Michigan v. Env't Prot. Agency*, 576 U.S. 743, 751–52 (2015).

### JURISDICTION AND VENUE

10.    This action is brought under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, and the ESA, 16 U.S.C. §§ 1531–44. This court has jurisdiction under 16 U.S.C. § 1540(g)(1); and 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (authorizing declaratory relief); and § 2202 (authorizing injunctive relief).

11.    Plaintiffs provided Defendants 60 days' notice of their intent to sue on December 10, 2024, as required by 16 U.S.C. § 1540(g)(2)(A)(i).[3] On January 30, 2025, the Fish and Wildlife Service acknowledged receipt of Plaintiffs' notice and denied that the Blanket Rule violates the ESA and APA.[4]

12.    Venue is proper in this court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because Plaintiffs reside in this district, Plaintiffs manage land and

---

[2] https://downloads.regulations.gov/FWS-HQ-ES-2023-0018-106269/attachment_1.pdf.

[3] Attachment 1 is an accurate copy of RMEF's and PERC's notice of intent to sue.

[4] Attachment 2 is an accurate copy of the Fish and Wildlife Service's response.

engage in habitat conservation activities in this district, and many of the consequences of the Service's violations are occurring or will occur in this district.

13.    This case concerns a nationwide regulation and is, therefore, subject to random assignment. L.R. 1.2(a)(3). It is properly filed in the Butte Division because PERC is a resident of Gallatin County, Montana, and the consequences of the Service's violations are occurring or will occur in this division.

**PARTIES**

**Plaintiffs**

***Rocky Mountain Elk Foundation***

14.    RMEF is a nonprofit public benefit corporation incorporated in Montana, with its headquarters and principal offices and place of business in Missoula, Montana. RMEF's mission is to ensure the future of elk, other wildlife, their habitat, and our hunting heritage.

15.    RMEF has conserved and restored nearly 9 million acres of wildlife habitat in North America. RMEF frequently partners with federal agencies, states, and private landowners to fund and implement conservation projects, such as prescribed burns, forest thinning, planting native vegetation, and installing wildlife-friendly fencing. In addition, RMEF works with private landowners and federal, state, and local agencies to conserve habitat through conservation easements and fee purchases.

16.    This work includes habitat occupied not only by elk but also by endangered and threatened species and species likely to be considered for future

listing, including greater sage grouse, westslope cutthroat trout, gray wolves, and arctic grayling.

17. RMEF has supported over 600 wildlife management and research projects across 33 states, at a cost exceeding $12,000,000, to better understand wildlife populations, ecology, and habitat needs.

18. RMEF works on many conservation projects in areas occupied by listed species and those likely to be considered for listing in the future. And RMEF is currently involved in developing more conservation projects and intends to continue developing such projects in the future. These projects involve habitat conservation activities regulated by the Blanket Rule, including prescribed fire, forest thinning, and planting native vegetation. 89 Fed. Reg. at 23,921. *See, e.g.,* Threatened Species Status for Eastern Black Rail with a Section 4(d) Rule, 85 Fed. Reg. 63,764, 63,798–99 (Oct. 8, 2020) (species-specific rule exempting prescribed fire from regulation to encourage its use as a habitat conservation and land-management tool).

19. Since 1994, RMEF has held a conservation easement on the Deer Creek property, a working ranch that conserves more than 7,000 acres of habitat for black bear, grizzly bear, elk, moose, mule deer, and pronghorn antelope. The easement protects a valuable element of the natural habitat of the Madison Mountains and the Madison River Valley in Montana. The property is within the range of Greater sage-grouse, gray wolf, and pygmy rabbit, all of which have been petitioned for listing under the ESA. In addition to owning the easement, RMEF has compensated the

landowner in cost-sharing projects to maintain quality habitat on the property, including treatments for invasive weeds.

20.    In 2019, RMEF acquired the 3,450-acre Bearmouth property in Western Montana to conserve wildlife habitat connectivity, public access, and four miles of perennial streams. The property provides habitat to elk and other ungulates, as well as Canada lynx, grizzly bears, westslope cutthroat trout, and gray wolves. Since owning the property, RMEF has performed habitat restoration through annual invasive weed treatments, fencing work, and limited grazing to remove decadent grasses. RMEF has also partnered with a state agency and another conservation group to restore a stream on the property and improve aquatic habitat, including for westslope cutthroat trout. RMEF has additional land management activities planned for the property, including further stream restoration, aspen restoration, and increased invasive weed treatments.

21.    In 2022, RMEF acquired an 829-acre property adjacent to the Mount Haggin Wildlife Management Area in Montana, which it then conveyed to Montana Fish, Wildlife, and Parks to be managed as part of the Wildlife Management Area. The property provides habitat for elk, mule deer, moose, pronghorn antelope, grizzly bear, gray wolf, wolverine, Canada lynx, brook trout, and westslope cutthroat trout. Since conveying the property to the state, RMEF has continued to invest in habitat maintenance and improvement on the property, by providing funding for and directly participating in treating invasive weeds, removing fencing, and thinning conifers.

Dozens of RMEF members and RMEF staff have volunteered their time to perform some of this habitat conservation work.

22.    RMEF has more than 215,000 members in the United States, including hunters, guides, outfitters, wildlife enthusiasts, and conservationists. These members have environmental, recreational, and economic interests in the conservation of wildlife and their habitat. RMEF members hunt or enjoy viewing wildlife, including listed species, species likely to be considered for listing in the future, and species that share habitat with such species. Members also operate outdoor-recreation businesses that depend on quality wildlife habitat, including outfitting and guide businesses.

23.    Many of these members' activities are regulated by the Blanket Rule's prohibition on beneficial conservation activities and incidental take. *Cf. Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180 (9th Cir. 2024) (holding that state regulations authorizing the trapping of non-listed species violated the ESA because of the risk that a listed species may inadvertently be harmed).

24.    The Blanket Rule also affects RMEF's members' environmental interests in visiting and enjoying areas with high-quality habitat by restricting state management of wildlife and their habitat, regulating private habitat maintenance and improvement, and reducing incentives for voluntary conservation.

### Property and Environment Research Center

25.    PERC is a nonprofit conservation organization dedicated to advancing conservation through markets, incentives, property rights, and partnerships. To that

end, it has produced substantial research on the importance of incentives to the recovery of species under the ESA, including research on how the Blanket Rule discourages habitat restoration and species recovery by regulating species in a way that is indifferent to whether species are improving or declining. *See, e.g.,* PERC, *A Field Guide for Wildlife Recovery* (2023).[5]

26.    Prior to the Blanket Rule's reinstatement, the Service tailored regulations to each species listed as threatened based on what was necessary and advisable for the conservation of that species. PERC participated in this process by filing comments urging the Service to avoid regulatory disincentives for states, private landowners, and other stakeholders conserving and restoring habitat.

27.    For example, when the Fish and Wildlife Service proposed to list the lesser prairie chicken as threatened and issue a tailored 4(d) rule for it, Lesser Prairie-Chicken; Threatened Status With Section 4(d) Rule for the Northern Distinct Population Segment, 86 Fed. Reg. 29,432 (proposed June 1, 2021), PERC filed a comment urging the Service to limit its regulation of grazing considering the role of grazing in conserving the species' grassland habitat. PERC also urged the Service to exclude voluntary habitat restoration activities from the regulation. When the Service finalized its decision and considered what regulation is necessary and advisable to conserve the species, it heeded PERC's advice and limited regulation of grazing. Lesser Prairie-Chicken; Threatened Status With Section 4(d) Rule for the Northern Distinct Population Segment, 87 Fed. Reg. 72,674, 72,675, 72,748–52 (Nov.

---

[5] https://www.perc.org/wp-content/uploads/2023/09/PERC_Field-Guide-for-Wildlife-Recovery.pdf.

25, 2022) (discussing the addition of a regulatory exemption for grazing and why such exemption is necessary and advisable for conservation).

28.    The Blanket Rule eliminates this process. 50 C.F.R. § 17.31(a) (applying the Blanket Rule to threatened species automatically, without any consideration of whether such application is necessary and advisable for the species). *See* 89 Fed. Reg. at 23,922 (stating that the Service "will not make separate 'necessary and advisable' determinations" when the Blanket Rule applies to threatened species).

29.    PERC also works with private landowners and other partners on incentive- and market-based conservation projects. These projects frequently seek to maintain or improve wildlife habitat, including habitat for listed species and those likely to be considered for listing in the future. The Blanket Rule impacts these and similar planned projects by regulating areas containing these species, regulating conservation activities needed to maintain and improve habitat, and reducing incentives for landowners and land managers to conserve species and their habitats.

30.    In Montana's Centennial Valley, for instance, PERC has contracted with a ranching family to manage its cattle to avoid conflict with grizzly bears, to use nonlethal means to mitigate conflict, including hazing, and to forego seeking the lethal removal of grizzly bears if conflict does occur. That project relies on the fact that grizzly bears, although listed, are not regulated by the Blanket Rule. *See* 50 C.F.R. § 17.40(b). Instead, a regulation tailored to the needs of that species provides states and landowners regulatory flexibility to manage conflict, flexibility that our agreement depends on. *See id.* The Blanket Rule precludes PERC from developing

similar projects for other threatened species unless PERC or its partners obtain a costly federal permit.

31.    PERC has partnered with ranchers in Montana on several habitat leases that compensate landowners for providing wildlife habitat and incentivize them to perform habitat maintenance and restoration, such as replacing traditional fence with virtual or wildlife-friendly fence, conserving riparian areas, and removing invasive weeds. These leases seek to improve habitat for gray wolves, arctic grayling, greater sage grouse, and other species being considered for listing or likely to be considered in the future. And they involve activities regulated by the Blanket Rule but routinely excluded from regulation under species-specific rules.

32.    PERC has a memorandum of understanding with the State of Utah to develop a market to acquire or lease water rights to replenish the Great Salt Lake. PERC is also pursuing leases with farmers and other landowners to provide water for the lake. The Great Salt Lake is habitat for Wilson's phalarope, a species that has been petitioned for listing under the ESA. *See* Center for Biological Diversity et al., *Petition to the U.S. Fish and Wildlife Service to List Wilson's Phalarope (Phalaropus Tricolor) Under the Endangered Species Act as a Threatened Species and to Concurrently Designate Critical Habitat* (Mar. 28, 2024).[6] Under the Blanket Rule, conversion of water from conservation use back to agricultural use at the end of a lease may be prohibited. *Cf. Yurok Tribe v. U.S. Bureau of Reclamation*, 654 F. Supp. 3d 941 (N.D. Cal. 2023) (holding that the ESA preempts a state's power to direct a

---

[6] https://biologicaldiversity.org/species/birds/pdfs/Wilsons-Phalarope-Petition.pdf.

water right be used for agricultural that had previously been used to support fish). This discourages farmers from leasing water for conservation.

33.     PERC is pursuing leases of state trust land to conserve wildlife habitat and migration corridors, including in areas occupied by greater sage grouse and pygmy rabbit. States are obligated to manage these lands for the benefit of public institutions, especially public schools. By purchasing conservation leases on these lands, PERC seeks to make state trust lands' conservation value a source of revenue for schools, which would require the state to account for this value when leasing land for conservation or other uses. Under their fiduciary duties, states are required to account for both short-term revenue and long-term revenue potential when awarding leases. *See* Temple Stoellinger et al., *State Trust Land Revenue Diversification Through Conservation*, 2025 Utah L. Rev. 1, 18–19 (2025). Under the blanket rule, the presence of a species that may be listed in the future, or the presence of such species' habitat, would restrict the future revenue potential of state trust land. Thus, a state considering a conservation lease that would maintain habitat or attract a species that may be listed in the future must either reject a conservation lease or charge a higher price to account for future revenue reductions. *Id.*

## Defendants

34.     The U.S. Department of the Interior is an agency of the United States that Congress has charged with administering the ESA for nonmarine species.

35.    The U.S. Fish and Wildlife Service is an agency within the U.S. Department of the Interior. The Department has delegated responsibility for the day-to-day implementation and enforcement of the ESA to the Service.

## LEGAL BACKGROUND

### Administrative Procedure Act (APA)

36.    Under the APA, a person who is adversely affected, aggrieved, or suffers legal wrong because of an agency action is entitled to judicial review of the action. 5 U.S.C. § 702.

37.    In reviewing the agency action, the court is empowered to decide all questions of law, interpret statutes, and determine the meaning and applicability of the action. 5 U.S.C. § 706.

38.    A reviewing court shall hold unlawful and set aside agency actions it finds to be (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or (2) that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (2)(C).

39.    Agency actions are arbitrary and capricious when the agency (1) "has relied on factors Congress did not intend it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency, or" (4) the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

40.    Agencies must furnish reasoned explanations for their actions and reasoned responses to comments received during the notice and comment period to show that the action is not arbitrary and capricious. *See Ohio v. Env't Prot. Agency*, 603 U.S. 279, 293–94 (2024).

## Endangered Species Act (ESA)

41.    The ESA is intended to provide for the conservation, *i.e.* recovery, of endangered and threatened species, including by promoting habitat conservation and restoration. 16 U.S.C. §§ 1531(b), 1532(3) (defining conservation in recovery terms).

42.    The ESA is triggered by a species' listing as either endangered or threatened. An "endangered species" is one that "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species," is one "which is likely to become an endangered species" in the foreseeable future. 16 U.S.C. § 1532(20). Each species' status is assessed based on the analysis of five factors using "the best scientific and commercial data available." 16 U.S.C. §§ 1533(a)(1), (b)(1)(A).

43.    Generally, the Service is responsible for implementing the ESA with respect to terrestrial species, while the NMFS implements the ESA for marine and anadromous species.

44.    A species' listing has several automatic consequences. For example, federal agencies have an obligation under Section 7 to "utilize their authorities" to "carry[] out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1). Federal agencies also have a related requirement to,

in consultation with the Service or NMFS, "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" critical habitat. 16 U.S.C. § 1536(a)(2).

45.     An endangered listing also triggers an automatic prohibition against the unpermitted "take" of such species under Section 9. 16 U.S.C. § 1538. Take is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). And the Service has broadly interpreted take to include activities that incidentally cause de minimis harm to a member of a species, including habitat modification. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 701–08 (1995).

46.     Congress intentionally excluded threatened species from Section 9's blanket take prohibition. It did so, according to legislative history, to "minimize[e] the use of the most stringent prohibitions," which it believed should "be absolutely enforced only for those species on the brink of extinction." *See* Congressional Research Service, *A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980*, at 358 (statement of Sen. Tunney).

47.     In addition to its categorical provisions, Section 4 of the ESA provides for several species-specific determinations. These include listing decisions, designation of critical habitat, regulation of "look alike" species, development of recovery plans, and, relevant here, regulation of threatened species. 16 U.S.C. § 1533.

48.    Under Section 4(a), for instance, "a determination . . . that a species is an endangered species or threatened species" triggers a requirement to "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A). To do so, the Service must engage in a species-specific analysis of science, the species' habitat needs, and the economic and other consequences of the designation. 16 U.S.C. §§ 1532(5), 1533(a)(3), 1533(b)(2).

49.    Under Section 4(d) of the ESA, "[w]henever any species is listed as a threatened species," the Service is authorized to issue regulations "necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). Congress defined "conservation," in relevant part, as "to bring" the species "to the point at which the measures provided pursuant to this chapter are no longer necessary"—a standard focused on recovering species to the point that they are no longer endangered or threatened. 16 U.S.C. § 1532(3).

50.    The Service's authority to issue regulations necessary and advisable to recover a threatened species includes regulations "prohibit[ing] with respect to any threatened species any act prohibited . . . with respect to endangered species." 16 U.S.C. § 1533(d). *See Man Hing Ivory and Imps., Inc. v. Deukmejian*, 702 F.2d 760, 764 (9th Cir. 1983). However, in states with a "cooperative agreement" under the ESA, such regulations cannot go into effect without the states' assent. 16 U.S.C. § 1533(d).

51.    When Congress enacted this provision, it was well understood to be limited to regulations issued in response to a species' listing and tailored to the needs

of that species. The Senate Report, for instance, explains that Section 4(d) allows the Service to "make any or all of the acts and conduct defined as 'prohibited acts' . . . as to 'endangered species' also prohibited acts *as to the particular threatened species.*" S. Rep. No. 93-307 (1973) (emphasis added). In 1973, a Department of the Interior official, in testimony supporting the ESA, shared this understanding, representing to Congress that any regulation of threatened species must "depend on the circumstances of each species." *See* Letter from Douglas P. Wheeler, Acting Assistant Sec'y of the Interior, to Rep. Leonor Sullivan, Chairman, H. Comm. on Merch. Marine and Fisheries (Mar. 23, 1973) in *A Legislative History of the Endangered Species Act*, *supra* at 162.

52.    The ESA authorizes "any person" to sue federal agencies for alleged violations of any provision of the Act. 16 U.S.C. § 1540(g). Such suit must be preceded by written notice 60 days before the case is filed. *Id.*

## FACTUAL ALLEGATIONS

## The Service's "Blanket Rule" Erodes the Distinction Between Endangered and Threatened Species

53.    The Service and NMFS have taken diametrically opposite approaches to regulating threatened species under Section 4(d).

54.    Whenever a species is listed as threatened, NMFS considers what regulatory approach would promote that species' conservation and issues a regulation tailored to that species.

55.    The Service has, instead, adopted an unscientific approach of regulating endangered and threatened species the same, ignoring distinctions between endangered and threatened species and among threatened species.

56.    The Service first adopted a Blanket Rule in 1975. *See* Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44,412, 44,414, 44,425 (Sept. 26, 1975). Under that rule, like the current version, the prohibitions in Section 9 automatically applied to threatened species. *Id.* When it adopted the Blanket Rule in 1975, the Service offered no explanation or analysis to explain how the Rule is necessary and advisable for the conservation of any threatened species. *Id.*

57.    The few exceptions to the Blanket Rule are narrow. With the Service's approval, a federal or state official may, for instance, take a species while implementing a conservation program. 50 C.F.R. § 17.31(b)(3). Additionally, a federal or state official may take any threatened species to aid, salvage, or dispose of the species. 50 C.F.R. § 17.31(b)(1). Other activities a state may wish to undertake to manage the species and its habitat, including conservation actions, are prohibited without a federal permit.

58.    The Blanket Rule contains no exceptions for private landowners or private entities acting on public or private land, including their conservation activities. Therefore, from their perspective, the Blanket Rule eliminates any distinction between endangered and threatened species. If conservation groups, landowners, and other stakeholders help improve a species' status from endangered

to threatened by investing in habitat restoration and recovery efforts the regulatory burdens imposed on them do not change.

59.    In practice, the Blanket Rule has been applied in a rote and unscientific manner. Whenever a species is listed as threatened, the Service provides no evidence, analysis, or explanation that the Blanket Rule is necessary and advisable for the conservation of that species. When the northern spotted owl was listed as threatened, for instance, the Service simply acknowledged, without comment or justification, that "implementing regulations found at 50 C.F.R. 17.21 and 17.31 set forth a series of general prohibitions and exceptions that generally apply to all threatened wildlife." Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114, 26,193 (June 26, 1990). The same was true of the Gunnison sage-grouse, delta smelt, and many other threatened species. *See, e.g.,* Threatened Status for Gunnison Sage-Grouse, 79 Fed. Reg. 69,192, 69,306 (Nov. 20, 2014); Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854, 12,862 (Mar. 5, 1993); Determination of Threatened Status for the Pacific Coast Population of the Western Snowy Plover, 58 Fed. Reg. 12,864, 12,873 (Mar. 5 1983); Final Rule to List the Mexican Spotted Owl as a Threatened Species, 58 Fed. Reg. 14,248, 14,270 (Mar. 16, 1993); Determination of Threatened Status for the Washington, Oregon, and California Population of the Marbled Murrelet, 57 Fed. Reg. 45,328, 45,337 (Oct. 1, 1992).

60.    The Service retains the authority to amend the Blanket Rule to exclude a species from its application. 50 C.F.R. § 17.31(c). This can only be done through the

formal adoption of a separate regulation providing alternative measures for a particular species. *Id.* If the Service does nothing with respect to a particular species, the Blanket Rule applies automatically.

61.    The Service has rarely departed from the Blanket Rule. For approximately 75% of species listed as threatened, the Blanket Rule has been applied without comment, explanation, or evidence. *See* 89 Fed. Reg. at 23,921.

62.    In the rare cases where the Service departs from the Blanket Rule, it analyzes how that species-specific regulation is necessary and advisable for the conservation of the species—analysis that never occurs for species covered by the Blanket Rule. *Compare* Threatened Species Status for the Olympia Pocket Gopher, Roy Prairie Pocket Gopher, Tenino Pocket Gopher, and Yelm Pocket Gopher, With Special Rule, 79 Fed. Reg. 19,760, 19,760, 19,762–63, 19,770–71, 19,790–94 (Apr. 9, 2014) (discussing why a species-specific rule was necessary and advisable to conserve the species), *with* 55 Fed. Reg. at 26,193 (simply acknowledging that "implementing regulations found at 50 CFR 17.21 and 17.31 set forth a series of general prohibitions and exceptions that generally apply to all threatened wildlife").

63.    While the ESA's goal is to recover species and Section 4(d) is governed by a recovery standard, species recovery has been exceedingly rare in practice. To date, a mere 3% of all domestic listed species have recovered. Katherine Wright and Shawn Regan, *Missing the Mark: How the Endangered Species Act Falls Short of Its Own Recovery Goals*, PERC (2023).[7] However, the divergent approaches of the Service

---

[7] https://www.perc.org/2023/07/26/missing-the-mark/.

and NMFS have produced significantly different results. NMFS, by tailoring regulations to each threatened species, has recovered species at nearly triple the rate (6.7%) of the Service (2.5%). PERC, Comment at 11.[8] *See also* U.S. Fish and Wildlife Serv., *Environmental Conservation Online System: Delisted Species* (last visited Mar. 7, 2025) (reporting the species that have recovered and the lead agency for each).[9]

### The Service Rescinds the Blanket Rule to Improve Incentives for Restoring Habitat and Recovering Species

64.    In 2019, the Service rescinded the Blanket Rule (the "2019 Rule"). 84 Fed. Reg. 44,753. Under the 2019 Rule, species listed prior to the 2019 Rule's effective date would continue to be regulated as before. *Id.* But any subsequently listed species would be regulated pursuant to rules tailored to that species' unique conservation needs. *Id.*

65.    In adopting the 2019 Rule, the Service noted that it had "seen many benefits" of rules "tailor[ed] to the needs of threatened species," including the removal of redundant permitting requirements, easing the implementation of conservation measures, and focusing the Service's limited resources on the actual threats to a species. *Id.* at 44,754. Furthermore, the Service explained that the 2019 Rule brought it into conformity with NMFS's approach. *Id.*

66.    In particular, the Service found that tailoring regulations to each threatened species would better "incentivize conservation for both endangered

---

[8] https://downloads.regulations.gov/FWS-HQ-ES-2023-0018-106269/attachment_1.pdf.

[9] https://ecos.fws.gov/ecp/report/species-delisted.

species and threatened species." *Id.* at 44,757. This is because the 2019 Rule removed regulatory barriers to conservation efforts and gave private landowners and other stakeholders "an incentive to work on recovery actions" through the promise of regulatory relief as species recovered. *Id.*

67.    Both PERC and RMEF supported the 2019 Rule's rescission of the Blanket Rule. PERC's comment supporting the 2019 Rule, for instance, noted that it would "remov[e] barriers to projects involving threatened species, including habitat improvement projects" and would provide for "faster and more widespread recovery of listed species." PERC, Public Comment on the Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants at 5 (Sept. 24, 2018).[10]

68.    After the 2019 Rule was adopted, the Service listed dozens of species as threatened and issued a tailored regulation under Section 4(d) for each one. *See* 89 Fed. Reg. at 23,928.

69.    Each time the Service issued a regulation for a threatened species, it considered what regulatory approach was necessary and advisable for that species' conservation. *See, e.g.,* Lesser Prairie Chicken: Threatened Status with Section 4(d) Rule, 87 Fed. Reg. at 72,715, 72,717, 72,742–44, 72,748–52.

70.    For any of these species, the Service could have found that endangered-level regulation, equivalent to what would be imposed under the Blanket Rule, was the best way to recover that species. However, it notably did not find that approach appropriate for a single wildlife species listed as threatened under the 2019 Rule. *See*

---

[10] https://downloads.regulations.gov/FWS-HQ-ES-2018-0007-60158/attachment_1.pdf.

Regulations Pertaining to Endangered and Threatened Wildlife and Plants, 88 Fed. Reg. 40,742, 40,744 (proposed June 22, 2023).

71.    Instead, the Service consistently found it best to issue a tailored and less burdensome regulation to protect threatened species each time. In particular, the Service found it appropriate to avoid regulation of beneficial conservation actions, like habitat restoration, and other activities with only incidental impacts to the species. 89 Fed. Reg. at 23,921.

### Readoption of the Blanket Rule

72.    In 2023, the Service proposed reinstating the Blanket Rule. *See* 88 Fed. Reg. 40,742.

73.    In explaining its proposal, the Service did not dispute its earlier determination that tailoring regulations to the needs of each threatened species promotes recovery. Instead, it reaffirmed the "significant conservation benefits from developing and implementing species-specific rules," including "facilitating implementation of beneficial conservation actions," and "mak[ing] better use of [the Service's] limited personnel and fiscal resources and reduc[ing] regulatory burden." *Id.* at 40,745.

74.    Both RMEF and PERC submitted comments opposing readoption of the Blanket Rule.

75.    RMEF's comment urged the Service to retain the 2019 rule "to ensure that future ESA management for threatened species is considered for each species,

based on the best available science and not on an overarching 'blanket' policy." *See* RMEF, Public Comment on Proposed Blanket Rule at 2 (Aug. 21, 2023).[11]

76.    PERC's comment stressed that the Blanket Rule's policy of denying states and private landowners any benefit when species' prospects improve gives them "little incentive to invest in the efforts required to achieve that recovery progress." *See* PERC, Comment Opposing the Proposed Reinstatement of the "Blanket Rule" at 9.

77.    PERC and RMEF's comments also notified the Service that the ESA does not authorize the Service to issue the Blanket Rule, that its rationale for the Rule was inconsistent with ESA standards, and that the inconsistencies in the Service's explanation for the Rule and failure to grapple with the available evidence was arbitrary and capricious. *See, e.g., id.* at 5–16.

78.    RMEF and PERC were not alone in criticizing the proposed rule. State wildlife agencies, state land-managers, private landowners, and other stakeholders criticized the rule on the grounds that it would discourage habitat conservation and restoration.

79.    Nineteen states joined in a comment criticizing the proposed rule on the grounds that it would create perverse incentives "and discourage creative conservation efforts." Alabama et al., Comment on three related proposed rulemakings at 14 (Aug. 21, 2023).[12] By varying the extent of regulation between

---

[11] https://downloads.regulations.gov/FWS-HQ-ES-2023-0018-106016/attachment_1.pdf.

[12] https://downloads.regulations.gov/FWS-HQ-ES-2023-0018-106308/attachment_1.pdf.

endangered and threatened species, the states explained, the 2019 Rule "aligned the incentives of landowners with the interests of at risk species." *Id.* at 7.

80.    The National Association of State Foresters, representing the directors of state forestry agencies that help manage over 500 million acres of forests, noted that listed species "can be harmed by unspecific blanket rules and the so-called 'protections' they provide." Nat'l Ass'n of State Foresters, Comment Addressing Three Separate Proposed ESA Rule Changes at 1–2 (Aug. 17, 2023).[13] This is because the Blanket Rule "reduces the options for land managers to proactively participate in the long-term conservation of endangered and threatened species." *Id.* at 3. These land managers' willingness to conserve and restore habitat "may disappear should a blanket ruling be reinstated." *Id.* at 3.

81.    A state agency charged with managing state trust land to generate revenue for schools and other purposes criticized the rule on the grounds that it would put the agency's fiduciary duty in conflict with conservation. *See* Tex. Gen. Land Off., Comment on Three Proposed Rules Implementing the ESA at 2 (Aug. 17, 2023).[14] The Blanket Rule would put managing state land to benefit species and their habitat at odds with maximizing revenue for schools. *Id.*

82.    The Forest Landowners Association, representing private landowners who own or manage more than 55 million acres of forest habitat, urged the Service to withdraw the proposal. It noted that private landowners "respond in a much more

positive manner when encouraged to participate in collaborative species conservation." Forest Landowners Ass'n, Comment in Proposed ESA Regulations at 2 (Aug. 21, 2023).[15] "For most private forest landowners," regulations that make species and their habitats a liability for them "effectively end any desire to proactively work to restore a species." *Id.* The Association also noted that tailored regulations for threatened species routinely exclude forestry activities needed to "simultaneously protect species habitat and conduct the management activities needed to keep . . . forests healthy." *Id.* at 3. "Returning to the blanket rule," the Association continued, "will have a chilling effect on collaborative conservation by broadly and indiscriminately regulating" private lands. *Id.*

83.     The National Alliance of Forest Owners echoed these concerns. Nat'l All. of Forest Owners, Comment on Proposed ESA Regulations (Aug. 21, 2023).[16] It emphasized, for instance, that "returning to a blanket rule erodes the support of key stakeholders most directly involved in species conservation"—private landowners. *Id.* at 3. Instead, the Alliance urged the Service to stick with the 2019 Rule, thereby maintaining "regulatory incentives for private forest owners . . . to achieve conservation outcomes that limit endangered designations." *Id.*

84.     Despite the litany of concerns expressed by commenters, the Service formally reinstated the Blanket Rule on April 5, 2024. 89 Fed. Reg. 23,919. The Service also amended the narrow exemption for federal and state officials aiding,

---

[15] https://downloads.regulations.gov/FWS-HQ-ES-2023-0018-106271/attachment_1.pdf.

[16] https://downloads.regulations.gov/FWS-HQ-ES-2023-0018-106305/attachment_1.pdf.

salvaging, or disposing of threatened species to include tribal officials doing the same activities. *Id.*

85.    In reinstating the Blanket Rule, the Service did not reverse its earlier finding that tailoring regulations based on science and the unique needs of each threatened species provides incentives to restore habitat and recover species. Instead, it reaffirmed that finding. *Id.* at 23,926 ("We do not deny the benefit of species-specific 4(d) rules as we referenced in our 2019 4(d) rule."); *see* 84 Fed. Reg. at 44,757 (describing those benefits). The Service also indicated that it did not expect the Blanket Rule to "influence[]" the Service or anyone else to implement any additional "actions to recover endangered species." 89 Fed. Reg. at 23,927.

86.    In response to arguments that the Blanket Rule was unlawful, the Service asserted that the use of "species" in Section 4(d), a term that can be singular or plural depending on context, authorized the Service to issue blanket rules covering all threatened species. *Id.* at 23,924.

87.    The Service also offered three reasons that the Blanket Rule is necessary and advisable for the conservation of threatened species.

88.    First, the Service asserted, without explanation or factual support, that a species' status as threatened is sufficient to justify the automatic application of Section 9's prohibitions. *Id.* at 23,923.

89.    Second, the Service asserted that, for some threatened species, it may lack information required to design a regulation tailored to that species. *Id.* By categorically prohibiting the take of all threatened species, the Service explained, the

Blanket Rule takes a "precautionary approach" to avoid the risk that the Service will list a species and then fail to issue a regulation necessary and advisable for its conservation. *Id.* The Service did not substantiate this concern nor explain why this rationale supported applying the Blanket Rule automatically to species for which lack of information is not a problem.

90.     Third, the Service argued that regulations for threatened species modeled after Section 9 are easier for the agency and the public to understand. *Id.* In offering this justification, the Service did not explain why it supported reinstating the Blanket Rule, rather than continuing to model species-specific regulations on Section 9 as the Service had done since 2019.

### Allegations Supporting Declaratory and Injunctive Relief

91.     The allegations made in paragraphs 1–90 are realleged and incorporated by reference.

92.     RMEF and PERC are currently being and will continue to be irreparably harmed without declaratory and injunctive relief against the Blanket Rule. The Rule directly and adversely affects Plaintiffs' interests.

93.     The Blanket Rule circumvents and eliminates the process for considering, for each threatened species, whether and what regulation is necessary and advisable for its conservation. On its face, the Blanket Rule applies automatically whenever a species is listed, without any act required to apply it to a species or analysis required to justify that application. 50 C.F.R. § 17.31(a). In announcing the Blanket Rule, the Service made clear that it "will not make separate 'necessary and

advisable' determinations" for species covered by the Rule. 89 Fed. Reg. at 23,922. And the Service consistently implemented the prior version of the Blanket Rule without any analysis or discussion. *See supra* ¶ 59. The removal of this step in the regulatory process injures RMEF's and PERC's interests in participating in that process, limiting restrictions on their and others' conservation activities, and avoiding counter-productive regulations that discourage landowners from maintaining and restoring habitat. *See supra* ¶ 22. This procedural injury is legally cognizable. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1514–17 (9th Cir. 1992).

94.     The Blanket Rule regulates RMEF and PERC's conservation activities, including prescribed fire, forest thinning, non-lethal take to minimize livestock conflict, stream restoration, and invasive weed control. *See* 89 Fed. Reg. at 23,921. The Service has acknowledged that such conservation activities were routinely excluded from regulation when it developed species-specific regulations, because costly and time-consuming permitting requirements discourage these activities. *See id.* This too is a legally cognizable injury. *See Meland v. Weber*, 2 F.4th 838, 845–46 (9th Cir. 2021) ("When a plaintiff is the actual object of the government's regulation, then 'there is ordinarily little question that the action . . . has caused him injury'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)).

95.     The Blanket Rule regulates private landowners' habitat maintenance and improvement activities and reduces incentives for them to undertake these activities. The Service acknowledges that species-specific rules, as compared to the Blanket Rule, create incentives for voluntary conservation. 84 Fed. Reg. at 44,757.

*See* 89 Fed. Reg. at 23,926 (reaffirming this earlier finding). States, private landowners, conservation groups, and other stakeholders, in their comments opposing the Blanket Rule, alerted the Service that it would discourage voluntary conservation efforts by private landowners. *See supra* ¶¶ 74–83. Studies cited in the comments show that the predictable result of imposing arbitrary regulatory burdens on private landowners who maintain habitat will be to encourage preemptive habitat destruction and discourage proactive habitat maintenance and restoration. *See, e.g.,* Dean Lueck & Jeffrey Michael, *Preemptive Habitat Destruction under the Endangered Species Act*, 46 J.L. & Econ. 27 (2003) (finding that misguided regulation of take of red-cockaded woodpecker led landowners to preemptively destroy habitat, resulting in an estimated 5% reduction in available habitat and a 20-40% reduction in the number of populations on private land). This reduced incentive for landowners to undertake conservation activities that RMEF and PERC seek to encourage and reward through their conservation projects is a legally cognizable injury. *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (A party is injured when third parties will "likely react in predictable ways" that harm its interests.); *Solar Energy Indus. Ass'n v. Fed. Energy Regul. Comm'n*, 80 F.4th 956, 990 (9th Cir. 2023) (A party is harmed by agency action that reduces incentives for activities it seeks to encourage to advance its environmental interests.).

96.     The Blanket Rule also affects RMEF and PERC's efforts to work with state agencies to manage and improve habitat on public land. PERC, for instance, seeks to lease state trust land for conservation. *See supra* ¶ 33. States are under a

fiduciary duty to manage these lands to generate long-term revenue for public schools and other institutes. *See Lassen v. Arizona*, 385 U.S. 458 (1967); *Ervien v. United States*, 251 U.S. 41 (1919). At least one state opposed the Blanket Rule on the grounds that it would put its fiduciary duties in conflict with conservation of wildlife habitat on state trust lands. *See supra* ¶ 81. Because the Blanket Rule will predictably discourage states from leasing trust land for conservation, the Rule injures PERC's interest in leasing these lands. *See All. for Hippocratic Med.*, 602 U.S. at 383.

97.    The Blanket Rule also injures RMEF's members' interest in hunting, recreating, and enjoying areas that provide habitat for listed and at-risk species, by limiting state management of wildlife and their habitat, restricting habitat maintenance and improvement, and reducing incentives for landowners to conserve habitat. *See supra* ¶ 22–24. A geographic nexus between the area members use to pursue their environmental and recreational interests and the area subject to an agency regulation is sufficient to establish a legally cognizable injury. *See WildEarth Guardians v. U.S. Dept. of Agric.*, 795 F.3d 1148, 1154–55 (9th Cir. 2015).

98.    These injuries began immediately once the Blanket Rule was reinstated. For instance, commentors, including public land managers and private landowners, alerted the Service that the Blanket Rule would discourage them from maintaining and improving wildlife habitat for fear of increased regulation in the future. *See supra* ¶ 80–83. Regulatory risks and reduced incentives for habitat conservation harms RMEF and PERC's interest in pursuing this conservation in partnership with states and private landowners. Immediate harms caused by anticipated regulatory burdens

are legally cognizable. *See Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 19 n.1 (2018) (holding that a landowner had standing to challenge a critical habitat designation because prospective purchasers would offer less for the land to account for future regulatory risks).

99.    The Blanket Rule also increases the risk of these harms occurring and worsening as additional species are listed as threatened and the Blanket Rule is automatically applied to them without any consideration of science, recovery needs, or incentives. *See Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) ("[A]n increased risk of harm can itself be injury in fact sufficient for standing."). The Service is now or will likely soon consider listing many species that implicate RMEF's and PERC's conservation interests, including the Wilson's phalarope, pigmy rabbit, arctic grayling, and gray wolves. *See, e.g., Ctr. for Biological Diversity v. Haaland*, No. 2:23-cv-2-DLC, 2024 WL 3728023 (D. Mt. Aug. 6, 2024) (ordering the Service to reconsider the status of arctic grayling); Compl., *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, No. 9:24-cv-44-DWM (D. Mt. filed Apr. 8, 2024) (seeking an order requiring the Service to reconsider the status of gray wolves).

100.    Plaintiffs have no plain, speedy, and adequate remedy at law.

101.    If not enjoined by this court, Defendants will continue to enforce the Blanket Rule, causing ongoing and irreparable harm to RMEF and PERC's interests.

102.    An actual and substantial controversy exists between Plaintiffs and Defendants over the Service's power to implement a Blanket Rule. *See* Attach. 2

(Service's response to RMEF's and PERC's 60-day notice letter disputing their claims).

103.    This case is currently justiciable because the Blanket Rule is currently in effect, it is a final agency action, it is causing Plaintiffs and their members direct and immediate harm, and those harms will increase as the Blanket Rule is automatically applied to more threatened species in a rote and unscientific manner.

104.    Injunctive and declaratory relief are therefore appropriate to resolve this controversy.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of Endangered Species Act: The Blanket Rule Exceeds the Service's Authority Under Section 4(d)**

105.    The allegations made in paragraphs 1–104 are realleged and incorporated by reference.

106.    Congress chose to limit automatic regulation of take under the ESA to species listed as endangered. 16 U.S.C. § 1538(a). It did not authorize the Service to reverse this policy decision.

107.    Instead, Section 4(d) of the ESA authorizes the Service to, "[w]henever any species is listed as a threatened species," issue regulations "necessary and advisable . . . for the conservation of such species." 16 U.S.C. § 1533(d). Regulation of take of threatened species is subject to these limits. *Lohn*, 559 F.3d at 962.

108.   The Blanket Rule upends Congress' design by automatically applying Section 9's prohibitions for endangered species to every threatened species without any consideration of science, the species' unique needs, and how such regulation will affect the species' recovery prospects. In effect, the Blanket Rule sidesteps the process Congress provided for regulating threatened species.

109.   The Service's argument that the Blanket Rule is authorized because Section 4(d) uses the term "species" is spurious. While the term "species" can be singular or plural depending on context, Section 4(d)'s language demonstrates that it is referring to individual species. *See e.g.*, *id.* ("Whenever *any* species *is* listed as *a* threatened species" (emphasis added)); *id.* ("*such* species" (emphasis added)); *id.* ("*any* threatened species" (emphasis added)).

110.   Section 4(d)'s text mirrors other provisions in Section 4 that authorize only species-specific actions. *See, e.g.,* 16 U.S.C. § 1533(a)(3) (directing the Service, whenever it lists "a species" as "an endangered species or a threatened species," to designate critical habitat for "such species"); 16 U.S.C. § 1533(e) (providing that the Service may "treat any species as an endangered species or a threatened species" if "such species" sufficiently resembles "a species which has been listed").

111.   The structure of the ESA confirms that Section 4(d) is limited to species-specific regulations. If Congress wished to authorize blanket regulations for threatened species, it would have placed that power in Section 9. *See* 16 U.S.C. § 1538 (describing general prohibitions on take, holding animals in captivity, and importing species products). Instead, it placed this power in Section 4, which addresses species-

specific determinations authorized under the ESA. 16 U.S.C. § 1533 (describing the process for listing individual species, designating critical habitat for each species, regulating a species that closely resembles a listed species, and developing recovery plans for each species).

112.    Section 4(d) also conspicuously omits language that Congress used to refer to species in the plural. *See, e.g.,* 16 U.S.C. § 1533(c)(2)(A) (directing the Service to review the status of "all species" every five years); 16 U.S.C. § 1533(f)(1)(A) (referencing "those endangered species or threatened species . . . most likely to benefit from [recovery] plans"); 16 U.S.C. § 1533(f)(3) (requiring a report on recovery progress for "all species"); 16 U.S.C. § 1533(g) (requiring monitoring of "all species" that have been delisted).

113.    Section 4(d) also does not resemble other sections of the ESA authorizing general, as opposed to species-specific, regulations. *See* 16 U.S.C. §§ 1535, 1538(d)(3), 1539(f)(5), 1540(f).

114.    Therefore, Section 4(d) limits the Service to issuing regulations in response to the listing of individual species as threatened and tailored to that species based on science, that species' unique needs, and the incentives required to recover that species. The Blanket Rule violates these limits.

SECOND CLAIM FOR RELIEF

**Violation of Endangered Species Act: The Blanket Rule is not Necessary and Advisable for the Conservation of Threatened Species.**

115.   The allegations made in paragraphs 1–114 are realleged and incorporated by this reference.

116.   Section 4(d) of the ESA requires that any regulation issued by the Service be "necessary and advisable" to conserve threatened species. 16 U.S.C § 1533(d). *See Lohn*, 559 F.3d at 962. This standard requires regulations to be issued based on a determination that they contribute to a species' recovery. *See id.*; *Hodel*, 857 F.2d at 1333–34.

117.   In reinstating the Blanket Rule, the Service did not find that it would contribute to the recovery of any threatened species. Indeed, the Service stated that it did not expect the Blanket Rule to "influence[]" the Service or anyone else to "implement" any additional "actions to recover endangered species." 89 Fed. Reg. at 23,927. And it reaffirmed its earlier determination that tailoring rules to each threatened species, rather than applying the Blanket Rule, provides significant conservation benefits, including removing permitting obstacles from conservation activities and providing states and private landowners more of an incentive to recover species. 89 Fed. Reg. at 23,926.

118.   Instead of finding that the Blanket Rule would contribute to species recovery, the Service offered three other reasons for how the Blanket Rule satisfies the necessary and advisable standard, all of which are legally deficient.

119.    First, the Service asserted that a species' mere status as threatened justifies the extension of Section 9's prohibitions to it. 89 Fed. Reg. at 23,923. That rationale is inconsistent with Congress' choice to limit automatic application of Section 9 to endangered species. It is also irreconcilable with Section 4(d)'s use of a species' listing as threatened as the trigger for the Service's authority and further requirement that any regulation issued under that authority be necessary and advisable to the conservation of such species. 16 U.S.C. § 1533(d). The Service's rationale impermissibly conflates these two parts of Section 4(d), denying each independent meaning. *See Connell*, 988 F.3d at 1097.

120.    Second, the Service asserted that the Blanket Rule is necessary because, for some species, the Service may lack information to develop a tailored 4(d) rule. 89 Fed. Reg. at 23,923. This concern is contradicted by the evidence that, under the 2019 Rule, the Service developed a tailored rule for every species listed as threatened and by NMFS' decades of experience developing tailored rules. But, even if the Service's speculation were credited, it wouldn't justify adoption of the Blanket Rule. At best, it would support the Service taking a precautionary approach in the rare case that it lacks sufficient information to develop a more effective tailored regulation for a particular species. The Blanket Rule applies even to species for which the Service has abundant information and easily could design a tailored regulation that satisfied Section 4(d)'s requirements, without any explanation how such application is necessary and advisable to the conservation of threatened species.

121.    Finally, the Service asserted that the Blanket Rule is justified because modeling regulations for threatened species after Section 9 is easier for the Service and the public to understand. But, at most, this would mean that modeling regulations after Section 9, as the Service had under the 2019 Rule, is necessary and advisable for the conservation of threatened species. It offers no reason that it is necessary and advisable to arbitrarily impose the full prohibitions of Section 9 to every threatened species without considering the needs of that species. The Service did not explain how this rationale supported reinstatement of the Blanket Rule and its automatic application to all threatened species, as opposed to the continued modeling of species-specific rules on Section 9.

### THIRD CLAIM FOR RELIEF

### Violation of Administrative Procedure Act: The Service's Adoption of The Blanket Rule is arbitrary and capricious.

122.    The allegations made in paragraphs 1–121 are realleged and incorporated by this reference.

123.    The Blanket Rule is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Agencies must also furnish reasoned explanations for their actions and

reasoned responses to comments received during the notice and comment period to show that the action is not arbitrary and capricious. *See Ohio*, 603 U.S. at 293–94.

124.   The Blanket Rule is arbitrary and capricious for several reasons:

a.   The Service ignored evidence that NMFS has recovered species at a far better rate by tailoring regulations to each threatened species and failed to respond to comments raising this point.

b.   The Service failed to explain why it has reversed its earlier finding that tailored regulations better encourage conservation, compared to the Blanket Rule, by removing regulatory obstacles to voluntary conservation and providing incentives for states and landowners to undertake recovery efforts. If the Service hasn't reversed this earlier finding, it failed to provide a rational explanation for reinstating the Blanket Rule anyway and failed to respond to comments seeking such explanation.

c.   The Service refused to consider the Blanket Rule's real-world effects. It acknowledged, for instance, that the Blanket Rule previously applied to 75% of threatened species but, since the Blanket Rule was rescinded and the Service considered what was necessary and advisable for each species, it had not regulated any threatened species of wildlife so stringently. Yet it declined to consider the consequences of returning to the prior approach and how the costs that would be imposed on states and private landowners would affect their incentives to conserve and restore habitat. *See Michigan*, 576 U.S. at 751–52 (holding that it is arbitrary

and capricious for an agency to ignore costs under a broad statutory standard like necessary and advisable.).

        d.     The Service did not substantiate its concern that it may initially lack information necessary to design an effective regulation tailored to some species. Nor did it respond to comments noting that the Service had proven able to tailor regulations for every species listed as threatened under the 2019 Rule. It also did not respond to comments observing that, when the Blanket Rule was previously in place, the Service never applied it temporarily while it gathered information necessary to design and issue a tailored rule.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the court:

1.    Declare that the Service violated the ESA in issuing the Blanket Rule;

2.    Declare that the Service violated the APA by acting arbitrarily, capriciously, and in violation of the law by reinstating the Blanket Rule;

3.    Vacate the Blanket Rule and enjoin the Service from implementing it;

4.    Award any other relief the court deems just and proper.

DATED: March 10, 2025

Respectfully submitted,

/s/ Jonathan Wood

JONATHAN WOOD
MT Bar No. 67350062
Email: jonathan@perc.org
DYLAN P. SOARES*
CO Bar No. 58720
Email: dsoares@perc.org
Property and Environment
Research Center
2048 Analysis Dr., Ste. A
Bozeman, MT 59718
Telephone: 406-587-9591
*Pro hac vice pending

Attorneys for Plaintiffs