

*Sent via electronic mail and certified mail*

Dec. 10, 2024

| | |
|---|---|
| The Honorable Deb Haaland | The Honorable Martha Williams |
| Secretary, U.S. Dept. of the Interior | Director, U.S. Fish and Wildlife Service |
| 1849 C Street N.W. | 1849 C Street N.W., Rm. 3331 |
| Washington, D.C. 20240 | Washington, D.C. 20240 |
| exsec@ios.doi.gov | martha_williams@fws.gov |

**Re: 60-Day Notice of Intent to Sue over Violations of the Endangered Species Act: 4(d) Blanket Rule, 89 Fed. Reg. 23,919 (Apr. 5, 2024)**

Dear Secretary Haaland and Director Williams:

This letter serves as the Property and Environment Research Center's (PERC) and Rocky Mountain Elk Foundation's (RMEF) notice pursuant to 16 U.S.C. § 1540(g) that the U.S. Department of the Interior and the U.S. Fish and Wildlife Service (Service) violated the Endangered Species Act (ESA) and the Administrative Procedure Act (APA) by adopting the so-called "blanket rule."[1] Under this rule, Section 9's prohibitions for endangered species apply automatically to threatened species, without any evidence or analysis that such application advances the species' conservation. As PERC and RMEF explained in their comments opposing the proposed rule, the blanket rule unlawfully removes the ESA's clear distinction between endangered and threatened species. The rule also arbitrarily limits management flexibility, restricts habitat restoration, makes vulnerable species a liability for states and private landowners, and reduces incentives for recovery efforts.

The blanket rule violates the ESA for at least three reasons. First, Congress explicitly limited Section 9 to endangered species. For threatened species, Congress authorized science-based regulations in response to each species' listing and tailored to each species' unique needs. Section 4(d) does not authorize the Service to issue a blanket rule reversing Congress' choice to limit Section 9's automatic application to endangered species. Second, even if a blanket rule were permissible, Section 4(d) would still require such a rule to be "necessary and advisable" for species conservation. The Service's rationales for adopting the blanket rule conflict with this standard. Finally, the decision to reinstate the blanket rule was arbitrary and

---

[1] *See* 89 Fed. Reg. 23,919 (Apr. 5, 2024).

1

capricious because the Service failed to address the evidence, respond to comments, and explain its decision.

A. Background

The ESA requires the Service to list species that are endangered or threatened, based on the degree and immediacy of the threat of extinction. Listing triggers a variety of regulatory consequences and decisions. Under Section 9, "take" and other activities affecting endangered species are automatically prohibited. And, under Section 4, listing also triggers requirements for the Service to make several species-specific determinations, including the development of regulations for each threatened species to promote recovery.

This is not the first time the Service has issued a rule automatically extending Section 9's prohibitions to threatened species on a blanket basis. A blanket rule was first adopted, without explanation, in 1975 and remained in place until 2019.[2] When the blanket rule was previously in place, it was applied to 75% of species listed as threatened during that time.[3] The blanket rule was applied in a rote and unscientific manner.[4] And the Service recovered species at approximately a third of the rate of NMFS, which has never had a blanket rule.

In 2019, the Service rescinded the blanket rule,[5] aligning the Service's approach with that of NMFS (which, as noted above, has proven more effective at recovering species). The Service identified "many benefits" from rescinding the blanket rule, "including removing redundant permitting requirements, facilitating implementation of beneficial conservation actions, and making better use of [the Service's] limited personnel and fiscal resources by focusing prohibitions on the

---

[2] *See* Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44,412, 44,414, 44,425 (Sept. 26, 1975).

[3] *See* 89 Fed. Reg. at 23,921.

[4] *See, e.g., .,* Reclassification of the West Indian Manatee from Endangered to Threatened, 82 Fed. Reg. 16,668 (Apr. 5, 2017) (applying the blanket rule without any discussion or evidence to justify that application); Threatened Status for Gunnison Sage-Grouse, 79 Fed. Reg. 69,306 (Nov. 20, 2014) (same); Determination of Threatened Status for the Western Distinct Population Segment of the Yellow-billed Cuckoo (Coccyzus americanus), 79 Fed. Reg. 59,992 (Oct. 3, 2014) (same); Determination of Threatened Status for the Northern Idaho Ground Squirrel, 65 Fed. Reg. 17,779 (Apr. 5, 2000) (same); Determination of Threatened Status for the Delta Smelt and the Pacific Coast Population of the Western Snowy Plover, 58 Fed. Reg. 12,854 (Mar. 5, 1993) (same); Final Rule to List the Mexican Spotted Owl as a Threatened Species, 58 Fed. Reg. 14,248 (Mar. 16, 1993) (same); Determination of Threatened Status for the Washington, Oregon, and California Population of the Marbled Murrelet, 57 Fed. Reg. 45,328 (Oct. 1, 1992) (same); Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (same).

[5] Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753, 44,754 (Aug. 27, 2019).

stressors contributing to the threatened status of the species."[6] In particular, the Service found that tailoring regulations to each threatened species would better "incentivize conservation for both endangered species and threatened species[.]"[7] It would do so by removing regulatory barriers to conservation efforts and by giving private landowners and other stakeholders "an incentive to work on recovery actions" through the promise of regulatory relief as species move towards recovery.[8] This is in sharp contrast with the blanket rule, under which landowners who help recover a species could expect no regulatory relief until the species was delisted (an extremely rare and often long delayed event).

Since 2019, the Service has issued tailored rules for every species listed as threatened at the time of listing.[9] The rescission of the blanket rule did not limit the Service's ability to extend Section 9's prohibitions to a particular threatened species, if appropriate. Despite this, the Service found, for *every* wildlife species listed as threatened after 2019, the application of Section 9's take prohibitions was less conducive to conservation than a tailored rule.[10] This tailored approach contrasts with the Service's previous practice of reflexively applying the blanket rule 75% of the time.

On April 5, 2024, the Service reinstated the blanket rule. Even though the Service in 2019 found that rescinding the blanket rule would improve conservation incentives, the Service did not revisit those findings in its decision to reverse course. While acknowledging comments raising this point, the Service failed to discuss how the rule affects private landowners' incentives.[11] Indeed, the Service several times confirmed its earlier finding that regulations tailored to each species incentivize recovery efforts.[12] And, at one point, the Service suggested that it does not expect the blanket

---

[6] *Id.*

[7] *Id.* at 44,757.

[8] *Id.*

[9] Proposed Regulations Pertaining to Endangered and Threatened Wildlife and Plants, 88 Fed. Reg. 40,742, 40,744 (June 22, 2023).

[10] *Id.* This result is consistent with a half-century of NMFS tailoring regulations to each threatened species. It has extended all of Section 9's prohibitions to threatened species only 3% of the time.

[11] 89 Fed. Reg. at 23,925–26.

[12] *See id.* at 23,923 (limiting regulation "helps to conserve the species by incentivizing conservation through reducing unneeded permitting"); *id.* at 23,926 ("We do not deny the benefit of species-specific 4(d) rules as we referenced in our 2019 4(d) rule. . . [S]pecies-specific 4(d) rules can incentivize known beneficial actions for the species by removing or reducing regulatory burden[.]"); *id.* at 23, 929 (species-specific rules "help incentivize beneficial actions for the species by removing or reducing regulatory burdens associated with those actions").

rule to "influence[]" the Service or anyone else to "implement" any additional "actions to recover endangered species."[13]

The Service offered three primary reasons for reinstating the blanket rule. First, the Service asserted that a species' status as threatened justifies the automatic application of Section 9's prohibitions. Second, the Service asserted that the blanket rule avoids the risk that the Service will fail to issue a regulation necessary and advisable for a species' conservation. Finally, the Service offered a host of administrative convenience reasons—otherwise known as "the easy button"—that neither explain the decision to make the blanket rule's application automatic nor relate to Section 4(d)'s "necessary and advisable" standard.

**B.    The Service has no authority to issue a blanket rule reversing Congress' decision to encourage species recovery by regulating endangered and threatened species differently**

Congress intentionally limited the automatic application of Section 9's broad take prohibition to endangered species, conspicuously omitting threatened species. Congress could have included threatened species in Section 9 and authorized the Service to craft regulatory exemptions for those species, but it chose not to. Instead, to incentivize species recovery by matching the extent of regulation to the threats to the species, Congress chose not to automatically regulate the take of threatened species.

To be sure, the ESA authorizes the Service to issue regulations for species listed as threatened. But Section 4(d) is not an invitation for the Service to reverse Congress' choice to limit Section 9's automatic application to endangered species. Instead, the ESA confirms that such regulation cannot be issued on a blanket basis but must be based on a species-specific analysis of science, the species' needs, and incentives to recover the species.

Section 4(d)'s text precludes the use of blanket rules in several ways. First, it makes a species' listing as threatened (which is necessarily a species-specific event) the trigger for the Service's authority.[14] Second, Section 4(d) uses exclusively singular language in describing this power. [15] And, finally, Section 4(d) sets a standard for the issuance of regulations that requires knowledge about the specific species.[16]

---

[13] *Id.* at 23,927.

[14] 16 U.S.C. § 1533(d) ("Whenever any species is listed as a threatened species, . . .:). If Section 4(d) authorizes blanket rules, this trigger language makes no sense and has no effect.

[15] "Whenever *any* species *is* listed as *a* threatened species," the Service shall issue regulation for "such species." *Id.* (emphasis added).

[16] *Id.* ("necessary and advisable to provide for the conservation of such species"). *See* Jonathan Wood, *Take It to the Limit*, 33 Pace Envtl. L. Rev. 23, 33-34 (2015).

4

The Service disputes these textual arguments, relying on a D.C. Circuit decision that previously upheld the blanket rule.[17] In that case, the D.C. Circuit deferred to the Service's argument that Section 4(d) contains two separate authorities to issue regulations, only the second of which applies to the regulation of take of threatened species.[18] That rationale conflicts with decisions from several other circuits.[19] The D.C. Circuit did not address most of the textual arguments raised here. Instead, it relied on *Chevron* deference,[20] a doctrine which has since been overruled.[21]

The Service also argues that the blanket rule is lawful because "species" can be singular or plural in different contexts. But that does not make the blanket rule consistent with Section 4(d)'s text. The Service ignored other language showing that the use of the term in Section 4(d) is singular, including the use of "any," "is," and "a." Furthermore, references to "a species," "any species," and "such species" are ubiquitous in Section 4.[22] In every case, these phrases are used to describe the Service's power to make species-specific determinations in response to a listing. The blanket 4(d) rule is no more consistent with the ESA's text and structure than would be blanket rules to list species, to designate critical habitat, to regulate "look alike" species, or to issue recovery plans without any species-specific analysis. Thus, the blanket rule is contrary to the ESA's text and structure.

### C.   The Service's reasons for adopting the blanket rule are inconsistent with Section 4(d)'s "necessary and advisable" standard

Even if the Service could issue a blanket rule under Section 4(d), the Service's justification for doing so is unlawful. Section 4(d) requires that regulations be "necessary and advisable" to threatened species recovery. To satisfy this standard, the Service must consider all factors relevant to a species' recovery, including a

---

[17] 89 Fed. Reg. at 23,924. *see Sweet Home Chapter of Cmtys. for a Greater Or. v. Babbitt*, 1 F.3d 1, 8 (D.C. Cir. 1993), *modified on other grounds on reh'g*, 17 F.3d 1463 (D.C. Cir 1994), *rev'd on other grounds*, 515 U.S. 687 (1995).

[18] *See id.* at 5–8. The D.C. Circuit's rationale also presents a difficult puzzle. All the regulations that the Service has issued under Section 4(d) apply to varying extents prohibitions from Section 9 to threatened species. If Section 4(d) grants two separate authorities to the Service, why are there not examples of the Service exercising both authorities?

[19] *See, e.g., Trout Unlimited v. Lohn*, 559 F.3d 946 (9th Cir. 2009); *Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692 (10th Cir. 2010); *Christy v. Hodel*, 857 F.2d 1324, 1336 (9th Cir. 1988) (concluding that the reasoning adopted by the D.C. Circuit would result in a nondelegation doctrine problem).

[20] *Sweet Home*, 1 F.3d.at 5-8.

[21] *Loper Bright Enters v. Raimondo*, 144 S.Ct. 2244 (2024).

[22] *See* 16 U.S.C. § 1533(a)(2) (providing that, for "any species" within NMFS' authority for which NMFS determines "such species" is "an endangered species or a threatened species[,]" the Service shall list "such species" for NMFS); 16 U.S.C. § 1533(a)(3) (directing the Service, whenever it lists "a species" as "an endangered species or a threatened species," to designate critical habitat for "such species"); 16 U.S.C. § 1533(e) (providing that the Service may treat "any species" as "an endangered species or a threatened species" if "such species" sufficiently resembles "a species which has been listed").

regulation's effect on states' and landowners' incentives to restore habitat.[23] The Service issued the blanket rule without showing that this standard was met. Instead, each of the reasons offered to support the blanket rule is deficient.

First, the Service asserts that a species' threatened status is enough to justify the blanket application of Section 9's prohibitions. Not so. The ESA makes threatened status the trigger for the Service's regulatory authority, and then requires an additional showing that regulation is necessary and advisable to the species' conservation. By treating threatened status as sufficient for the necessary and advisable standard, the Service collapses these two standards and ignores half of Section 4(d)'s text.

Second, the Service justifies the blanket rule based on the risk that regulation would be necessary and advisable for a species' conservation but that the Service would fail to issue such regulation. This justification is belied by the fact that the Service issued a tailored rule for every species listed as threatened since 2019.[24] And this justification ignores the statute's text. Under Section 4(d), if regulation is necessary and advisable to a species' conservation, the Service is required to issue it.[25] The Service can't justify the blanket rule by speculating that the Service itself would violate this requirement in the future.

And, finally, the Service's administrative convenience reasons do not justify the rule or relate to the recovery standard. The Service asserts, for instance, that modeling Section 4(d) regulations after Section 9's prohibitions is easier for agency staff and the public to understand. But this doesn't support the automatic and blanket application of these prohibitions to species without further analysis. Instead, it at most suggests that the Service should have boilerplate regulatory text that could be applied to specific threatened species as they are listed, and the Service finds such regulation appropriate for that species.

**D.    The Service's adoption of the blanket rule was arbitrary and capricious**

Agency action is arbitrary and capricious if a decision is not based on relevant factors or reflects a clear error of judgment.[26] This standard is satisfied whenever an agency fails to consider relevant factors, uses reasoning that conflicts with the evidence

---

[23] *See, e.g., Michigan v. E.P.A.*, 576 U.S. 743 (2015) (holding that open ended standards like "necessary and advisable" require consideration of the costs imposed on regulated entities).

[24] 88 Fed. Reg. at 40,744.

[25] 16 U.S.C. § 1533(d) ("shall issue such regulations").

[26] *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

6

before it, or ignores public comment.[27] The adoption of the blanket rule fails this standard for several reasons.

PERC, RMEF, and other commenters presented the Service with evidence showing that the blanket rule has not promoted species recovery and that NMFS has achieved a far better recovery rate by tailoring rules to each species. Because the ESA defines "conservation" as a recovery standard,[28] whether a rule promotes species recovery is a relevant factor for issuing that rule. Yet the Service did not address this evidence nor respond to these comments.

We and other commenters pointed to the Service's earlier finding that the blanket rule undermined incentives to recover species by establishing the expectation that recovery progress would not be rewarded with regulatory relief for states and landowners. The Service acknowledged these comments but its response did not address the blanket rule's effect on incentives for private landowners.[29]

We and other commenters observed that the Service's assertion that the blanket rule does not affect how species are regulated is contrary to the available evidence. When the blanket rule has been in place, the Service applies all the blanket rule's prohibitions to 75% of species without any further analysis.[30] Without the blanket rule, the Service applied all the blanket rule's prohibitions to zero species of wildlife.[31] Despite continuing to assert that the blanket rule will not affect how species are regulated, the Service addressed none of this contrary evidence.

The Service suggested that the blanket rule applies to species only temporarily, while the Service develops information needed to develop a tailored rule. But we and other commenters presented evidence to the Service that, every time it has applied the blanket rule to a species, the Service has not later developed a tailored rule for that species. The Service ignored this evidence contradicting its rationale and failed to respond to these comments.

Finally, we and other commenters noted that the "necessary and advisable" standard requires consideration of the costs a rule will impose on states and landowners and how those costs affect their incentives to recover species.[32] The Service explicitly refused to consider these factors also.[33]

---

[27] *Id.*

[28] 16 U.S.C. § 1532(3).

[29] *See* 89 Fed. Reg. at 23,925–26.

[30] *See id.* at 23,921.

[31] *See* 88 Fed. Reg. at 40,744.

[32] *See Michigan v. EPA*, 576 U.S. 743, 769 (2015).

[33] *See* 89 Fed. Reg. at 23,933.

### E.  Conclusion

The Service's issuance of the blanket rule violates the ESA and APA. If the Service fails to withdraw the rule within 60 days of receiving this letter, PERC and RMEF intend to file a lawsuit requesting declaratory and injunctive relief.[34] If you believe these claims are incorrect, have any questions, or would like to discuss this matter further, please contact Jonathan Wood, PERC's Vice President of Law and Policy, at (406) 587-9591 or jonathan@perc.org.

Sincerely,

_____  _____
Brian Yablonski   Blake Henning
Chief Executive Officer   Chief Conservation Officer
Property and Environment   Rocky Mountain Elk Foundation
Research Center

---

[34] As the heads of their respective agencies, Secretary Haaland and Director Williams are the responsible officials who can provide PERC and RMEF the relief they're requesting.

8